IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 12, 2023

**PEDRO IGNACIO HERNANDEZ v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2011-A-525       Monte Watkins, Judge**
_____

**No. M2023-00796-CCA-R3-PC**
_____

The petitioner, Pedro Ignacio Hernandez, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received the effective assistance of counsel.  After our review of the record, briefs, and applicable law, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Manuel B. Russ, Nashville, Tennessee, for the appellant, Pedro Ignacio Hernandez.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Roger D. Moore, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

On direct appeal, this Court summarized the facts surrounding the petitioner's convictions for three counts of rape of a child, one count of attempted rape of a child, and five counts of aggravated sexual battery, as follows:

[T]he 12-year-old victim testified that she was born on January 11, 2001, and that she lived with her parents, her sister, her brother, and a friend

of her father, Hector Hernandez, and Mr. Hernandez's family. She said that in addition to those mentioned, the [petitioner] had also lived with her family when they lived [on] Canyon Ridge in Nashville. The victim recalled that when she was nine and a half years old, she reported to her school counselor that the [petitioner] had been "touching" her inappropriately. She said that the [petitioner] touched her in "the front where [her] private part; and like the back; and, [her] neck." Utilizing a drawing of a "[l]ittle girl who is naked," the victim circled the parts of her body that the [petitioner] had touched.

The victim recalled that on the day that she reported the touching to her school counselor, her little sister saw the [petitioner] pull the victim into his room, and the victim became "scared that he was going to do something to her too." She said that after pulling her into his room on that day, the [petitioner] tried to touch her "[f]ront part" and tried to pull her pants down, but she "kept on moving around." She said that there was "[a] little bit" of contact between the [petitioner's] hand and the "[o]utside" of her "[f]ront part." She indicated this location for the jury but did not mark it on the drawing.

The victim testified that on another occasion, the [petitioner] forced her onto the bed, and she then fell onto the floor because he had pulled her pants down, and she "couldn't get up." She said that he pushed her down and held her wrists. She said that she saw the [petitioner's] penis but that it did not touch her on that day. The [petitioner] did, however, touch the "outside" of her "private" with his hand. She recalled that "white stuff" came "out of his private and it got on [her] hand." She said that she thought the [petitioner] used a towel to "wipe it off" and that she "ran into the restroom" to wash her hands. She said that before the white stuff came out of the [petitioner's] "private," the [petitioner] "was trying to put [his penis] on [her] face," but she "elbowed him and then [she] ran." She also recalled that before the white stuff came out, the [petitioner] had been trying to put his penis into her vagina. She said that while she was in the floor, the [petitioner] pulled her pants down and "stuck it in there, but, like, only . . . on the . . . outside." She said that the [petitioner's] penis went "inside, but not like . . . deep inside." She said that the [petitioner] was "[m]oving back and forth."

The victim recalled another occasion when the [petitioner] placed his penis between her "butt cheeks" and moved it back and forth. She could not recall whether the [petitioner] ejaculated on that occasion.

The victim testified that on another occasion the [petitioner] kissed her "[i]nside that line" on the drawing of the girl. Again, she indicated the location for the jury but did not mark it on the drawing.

The victim also recalled an occasion when the [petitioner] "grabbed [her] and pushed [her] in his room" and then "threw [her] down on the bed, and then he just - - like, his hand was touching down in [her] private part." She indicated the location on the drawing as "[o]utside of the line."

The victim recalled another incident when the [petitioner] "just started touching [her] right in the front part."

She recalled that on another occasion the [petitioner] "barely" penetrated her "private part" with his penis before going to the closet to wipe "white stuff" on a red towel. She tried to differentiate yet another incident by demonstrating the relative positions of their bodies when the [petitioner] penetrated her vagina with his penis. On that occasion, she said, nothing came out of the [petitioner's] penis. She clarified that she only saw the [petitioner] wipe the "white stuff" with the red towel one time.

The victim testified that on another occasion, the unclothed [petitioner] climbed on top of her while she was clothed and began "moving back and forth." She said, "I kept moving my hand and then, like, the next thing I know when I saw my hand it had that white stuff on it."

She said that on another occasion when the [petitioner] had a "Dora blanket" on his bed, the [petitioner] got on top of her and "started kissing [her] neck." She said that the blanket was on the [petitioner's] bed all the time. She said that she knew some of the "white stuff" got onto the blanket because it left a "sticky" "white mark."

She said that in addition to the offenses about which she had testified, the [petitioner] had touched her inappropriately "[p]robably two more times." She said she could not remember specifically what had happened on those occasions.

The victim testified that all of the incidents happened when her parents were not home. She recalled one occasion when her sister might have seen the [petitioner] assaulting her. On that occasion the [petitioner] rubbed his penis against her body while she was clothed.

The victim said that she sometimes went into the [petitioner's] room to watch television before the touching began but that she did not go into that room after the assaults began. On one occasion when she was in his room watching television, the [petitioner] came into the room and began touching her waist and hip and kissing her neck.

The victim testified that on one occasion, the [petitioner] showed her a photograph of his genitalia on his cellular telephone. She could not recall when he had shown her the picture, where she was when she saw it, or what she was doing when she saw it.

The victim testified that she did not report the abuse because she "got scared that he was going to do something to" her. She admitted that she had no reason to believe that the [petitioner] would hurt her, saying, "I just thought he would do something." The victim testified that she did not share any of the details of the abuse with her mother because "it's embarrassing" and because she was "just scared."

Hollye Gallion, a pediatric nurse practitioner and the clinical director of the Our Kids Center in Nashville, testified as an expert in pediatric nursing and forensic examinations. She examined the victim on December 1, 2010. The victim told her, "This man who lives in my house, Pedro. He took me in his room and he locked the door, and he put his thing in my thing. And I kicked him in his stomach. And I pulled my pants up and ran away. It happened Monday afternoon." The victim reported that the [petitioner] had placed his hand on the inside of her "private" and that the abuse had occurred once a week for the six weeks prior to December 1, 2010. The victim's mother reported that in September 2010, the victim "had had an episode of genital bleeding and a rash" and had been "treated for a urinary trac[t] infection." The victim's mother also reported to Ms. Gallion that the victim had recently begun to complain "of pain with urination, again, and . . . a rash in her genital area." Ms. Gallion opined that there was no direct correlation between sexual activity and a urinary tract infection.

An anogenital examination of the victim revealed "a little superficial crack, or tear, in the skin on the inside of the left labia," "some areas of redness" adjacent to the victim's hymen, and "a little area of purplish color around the urethra." Ms. Gallion said that there was no injury or signs of trauma to the victim's hymen. Ms. Gallion noted that redness in the genital area was not uncommon in children due to their poor hygiene habits. She said that the injury to the victim's labia could be consistent with an injury

due to friction but that the discolored area around her urethra was a normal part of the victim's anatomy rather than a sign of trauma. Ms. Gallion said that it was not her job to opine whether the victim was or was not sexually abused.

Metropolitan Police Department ("Metro") Detective Eric Fitzgerald testified that he began investigating this case when contacted by the victim's school counselor. In that initial referral, Detective Fitzgerald learned "[t]hat a family friend had been doing things to [the victim], sexual things to her." After conducting a brief interview of the victim and her mother to ascertain "the basics" of the victim's claim, Detective Fitzgerald sent the victim for a forensic interview at the Child Advocacy Center. During the brief initial interview, Detective Fitzgerald suggested that someone in the victim's family wear "a body wire" to try to extract a confession from the [petitioner]. He recalled that the victim's mother was "indifferent" to the suggestion of a body wire and indicated a preference for accompanying the victim to the medical examination.

Detective Fitzgerald said that he and Officer Gilbert Ramirez, who spoke Spanish, contacted the victim's father and asked him to wear the body wire, and he agreed. Detective Fitzgerald explained that neither of the victim's parents spoke English and that Officer Ramirez worked as a translator. Detective Fitzgerald said that the victim's father, while fitted with audio recording equipment, tried to elicit a confession from the [petitioner] but was unsuccessful. Detective Fitzgerald testified that he had previously instructed the victim's father to ask the [petitioner] to leave if he did not confess to the abuse. He said that he and Officer Ramirez waited outside to intercept the [petitioner] after the victim's father ordered him out of the house. At that point, they asked the [petitioner] if he would come to the police department for an interview, and he agreed. Officer Ramirez transported the [petitioner] to the police station in a patrol car.

Detective Fitzgerald interviewed the [petitioner], with Officer Ramirez acting as an interpreter. A video recording of the interview, in which the [petitioner] spoke exclusively in Spanish and Officer Ramirez spoke primarily in Spanish, was played for the jury. The jury was also provided with a transcript that the parties had agreed was an accurate translation of the video. The transcript itself, which was prepared by a court certified interpreter, was made an exhibit. During the interview, the [petitioner] acknowledged having had sex with the victim, claiming that she had come into his room naked and demanded that he have sex with her. He

said that the victim threatened to tell her father if he did not comply and that he felt as though she was in a position of power because she could speak English and he could not. Detective Fitzgerald acknowledged that during the interview, he attempted to "minimize what the offense is and, kind of, present it in a light that it's not nearly as serious as someone would think it might be" in order to make the [petitioner] "feel a little more comfortable . . . and . . . open up a little bit."

Detective Fitzgerald said that he collected the rape kit from the Our Kids Center. From the [petitioner's] bedroom, he collected a Dora blanket, a blue towel, and a red towel. He took the items to the Metro property room and filled out a request that the items be sent to the Tennessee Bureau of Investigation ("TBI") for testing. He also submitted the buccal swabs that he obtained from the [petitioner] and the victim for deoxyribonucleic acid ("DNA") testing.

During cross-examination, Detective Fitzgerald acknowledged that he did not interview the other adults who lived in the house with the [petitioner] and the victim and that he did not collect the victim's clothing from her hamper. Detective Fitzgerald conceded that although the [petitioner's] DNA was located on the towels and blanket taken from the [petitioner's] room, the victim's DNA was not. He acknowledged that he collected the [petitioner's] cellular telephone but did not find a photograph of the [petitioner's] genitalia on the telephone.

TBI Special Agent and Forensic Scientist Doctor Laura Boos testified that testing performed on the Dora blanket confirmed the presence of semen and sperm and that DNA analysis confirmed that the [petitioner] was the contributor. The blue towel was negative for the presence of semen, but testing confirmed the presence of the [petitioner's] semen and sperm on the red towel. Doctor Boos testified that she did not find the victim's DNA on either of the towels or on the blanket.

During cross-examination, Doctor Boos acknowledged that the labial swab taken from the victim was negative for the presence of semen or sperm.

Officer Gilbert Ramirez testified that he utilized his experience in working with members of the Hispanic community when acting as an interpreter during the [petitioner's] interrogation. He said that he tried to ensure that the [petitioner] understood what he was talking about before moving on to the next question. He stated that on "several" occasions, the

- 6 -

[petitioner] appeared "a little puzzled," so Officer Ramirez took extra time to make sure that the [petitioner] understood. He said that he felt confident in his interaction with the [petitioner].

. . . .

Based upon the evidence presented at trial, the jury returned verdicts of guilty as charged of rape of a child in counts one, four, and five and of aggravated sexual battery in counts eleven, twelve, thirteen, and fifteen. The jury convicted the [petitioner] of the lesser included offenses of attempted rape of a child in count two and aggravated sexual battery in count three. The jury found the [petitioner] not guilty in counts six, seven, and fourteen. The jury was unable to reach a verdict in count eight, and the trial court declared a mistrial as to that count.

Following a sentencing hearing, the trial court imposed a sentence of 28 years for each of the [petitioner's] convictions of rape of a child and ordered that the sentences be served consecutively. The trial court imposed a sentence of 10 years each for the [petitioner's] convictions of aggravated sexual battery and a sentence of 10 years for his conviction of attempted rape of a child. The court ordered that the 10-year sentences for attempted rape of a child and aggravated sexual battery be served concurrently with each other and concurrently with the sentences imposed for the convictions of rape of a child. The total effective sentence is, therefore, 84 years.

*State v. Hernandez*, No. M2013-01321-CCA-R3-CD, 2014 WL 3740028, at *1-7 (Tenn. Crim. App. July 29, 2014), *perm. app. denied*, *designated not for citation* (Tenn. Dec. 19, 2014).

On direct appeal, this Court modified the sentences for the petitioner's rape of a child convictions to twenty-five years each and otherwise affirmed the trial court's judgments. *Id.* at *39-40. On April 24, 2019, the petitioner filed an untimely pro se petition for post-conviction relief, requesting that the statute of limitations be tolled based on his first post-conviction counsel's failure to timely file a petition for post-conviction relief.[1] *Hernandez v. State*, No. M2019-01305-CCA-R3-PC, 2020 WL 3412134, at *1 (Tenn. Crim. App. June 22, 2020), *no perm. app. filed*. The post-conviction court entered an order summarily denying and dismissing the petition, finding it was filed outside of the one-year statute of limitations. *Id.* The petitioner appealed, and this Court remanded for the appointment of counsel and a hearing to determine whether the petitioner was entitled to

---

[1] The petitioner's pro se petition for post-conviction relief is not included in the record.

- 7 -

due process tolling of the statute of limitations. *Id.* at *2. On remand, the post-conviction court granted the petitioner's motion to toll the statute of limitations. Following the appointment of counsel, the petitioner filed an amended petition for post-conviction relief, arguing, in part, trial counsel was ineffective for failing to call the petitioner as a witness during the suppression and competency hearings, failing to argue the correct legal basis for the exclusion of the victim's statement to medical personnel, and failing to require the trial court to make a ruling on the record related to certain 404(b) issues.[2] An evidentiary hearing was held on August 12, 2022, during which the petitioner and trial counsel testified.

The petitioner, through an interpreter, testified that he moved to the United States from Honduras in 2007. His highest level of education was the sixth grade, and he was unable to speak any English. Although trial counsel spoke Spanish, the petitioner was only able to understand "fifty percent" of what she said. However, trial counsel brought an interpreter with her "when there was like more work or stuff." Regarding discovery, the petitioner stated that trial counsel explained the material, but the petitioner did not fully understand it. However, the petitioner stated that trial counsel did not review with him either the petitioner's or the victim's statements to police. When asked if he understood what the victim's accusations were, the petitioner stated that it was the victim's school, and not the victim, who had accused him of misconduct. He testified that he did not know what he was convicted of or what the accusations against him were regarding. However, he later stated that trial counsel "told me that I was being accused of having harmed [the victim], but I told her I never did anything like that." The petitioner did not recall giving a statement to police following his arrest and stated that he met with two doctors prior to trial. Although the petitioner testified that he attended hearings prior to his trial, he did not know what they were regarding, and trial counsel did not speak to him about testifying at either of the hearings. According to the petitioner, the State presented an offer of "twenty years at thirty percent." However, the petitioner did not understand what "thirty percent" meant, and trial counsel did not explain it to him because she was "rushing to go home or something." Therefore, the petitioner decided to go to trial.

Trial counsel testified that she was appointed to the petitioner's case while working as a public defender.[3] Although she was fluent in Spanish, she sometimes utilized the services of an interpreter if she believed there was a misunderstanding between herself and the petitioner. Trial counsel reviewed discovery with the petitioner, but she did not leave a copy with him because she had concerns about both his ability to understand the materials and his safety at the jail if other inmates assisted the petitioner in reading the discovery. Although trial counsel recalled the State's extending the petitioner an offer in this case, she

---

[2] The amended petition did not incorporate by reference the claims contained in the pro se petition.

[3] Trial counsel testified via Zoom because she moved to California nine years prior to the evidentiary hearing.

could not recall the specifics of the offer. However, she would have conveyed any offers to the petitioner and agreed that the decision of whether to accept or decline an offer was ultimately the petitioner's to make.

Regarding the petitioner's mental capacity, trial counsel stated the petitioner was "probably the most impaired client [she] ever had. And so, it was like speaking with an eight to ten-year-old." Trial counsel hired a mental health expert who examined the petitioner and found him to be incompetent. However, she could not recall whether she thought about having the petitioner testify at the competency hearing. Trial counsel also stated that she filed a motion to suppress the petitioner's statement to police which the trial court denied, and although the denial was determined to be erroneous on direct appeal, it was also determined to be harmless. She could not recall whether she ever thought about having the petitioner testify at the motion to suppress, but she stated that "[i]t might have been" advantageous.

Regarding the victim's statement to medical personnel, trial counsel testified that she could not recall whether she considered raising an objection to the statement. However, she stated that there was not a strategic reason for her failure to object and agreed the statement was corroborative of the victim's in-court testimony. Trial counsel also could not recall a photograph of the petitioner's genitals from trial or whether she considered raising an objection to it under Tennessee Rule of Evidence 404(b). However, she stated that "if [she] missed an appropriate legal objection, there was no strategic reason for doing that."

After its review of the evidence presented, the post-conviction court denied relief, and this timely appeal followed.

### *Analysis*

On appeal, the petitioner argues trial counsel was ineffective for failing to call him to testify at the suppression and competency hearings, failing to request the exclusion of a photograph of the petitioner's genitals under 404(b), and failing to seek the exclusion of the victim's statement to medical personnel. The State contends the post-conviction court properly denied relief.

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v.*

*State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo,* affording a presumption of correctness only to the post-conviction court's findings of fact. *Id*.; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id*. Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*.; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption

that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

## I.    Failure to Call the Petitioner to Testify at Suppression and Competency Hearings

The petitioner argues trial counsel was ineffective for failing to call him to testify as a witness at the suppression and competency hearings. Specifically, he contends, had trial counsel elected to have him testify, "his mental deficiencies would have been transparent and this would have helped to carry his burden in proving the *Miranda*[4] violation to the trial court as well as demonstrating that the petitioner's expert as to competency should have been accredited." The petitioner also argues that if the trial court had excluded his statement, the petitioner could have negotiated a more favorable offer from the State. The State contends the post-conviction court properly found trial counsel was not ineffective for failing to call the petitioner to testify at the suppression and competency hearings.

According to the petitioner, he attended hearings prior to trial but did not know what they were regarding. He did not recall trial counsel's speaking with him about testifying at either hearing. The petitioner testified that he received an offer of twenty years at thirty percent from the State. However, because trial counsel would not explain what "thirty percent" meant, the petitioner did not accept the offer. Trial counsel testified that she filed a motion to suppress the petitioner's statement to police and had a mental health professional evaluate the petitioner for competency. However, she could not recall whether she thought about having the petitioner testify at the suppression or competency hearings. Trial counsel stated that, although she could recall plea negotiations taking place with the State, she could not recall the specific offer that they extended. She testified that she would have conveyed any offers to the petitioner and that the decision to accept or decline an offer was the petitioner's to make.

In its order denying relief, the post-conviction did not accredit the petitioner's testimony, and nothing in the record preponderates against the post-conviction court's factual findings. *See Tidwell*, 922 S.W.2d at 500. Furthermore, although the petitioner argues trial counsel should have called him as a witness at the suppression and competency hearings, the petitioner failed to state what his testimony at the hearings would have been and, therefore, cannot establish prejudice. *See State v. Anglin*, No. M2019-00083-CCA-R3-PC, 2019 WL 6954185, at *9 (Tenn. Crim. App. Dec. 19, 2019) ("Without knowing how the Petitioner might have testified, the post-conviction court had no basis from which it might conclude that he suffered prejudice from following his attorneys' advice not to

---

[4] *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

- 11 -

testify."), *no perm. app. filed*; *Black v. State*, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990). The petitioner is not entitled to relief on this issue.

## II.     Failure to Request the Exclusion of Photograph Under 404(b)

The petitioner argues trial counsel was ineffective for failing to request the exclusion of a photograph of the petitioner's genitals under Tennessee Rule of Evidence 404(b). The petitioner argues that, although trial counsel objected to the photograph on the basis of Tennessee Rule of Evidence 403, Rule 404(b) provided a more favorable standard of review. The State contends this issue was waived for failing to include it in his petition for post-conviction relief.

While the petitioner challenged other aspects of trial counsel's performance regarding evidentiary issues, the petitioner failed to challenge trial counsel's failure to request the exclusion of a photograph of the petitioner's genitals under 404(b) in either his original or amended petitions for post-conviction relief. At the evidentiary hearing, the petitioner asked trial counsel if she remembered objecting to the photograph of the petitioner's genitals under 403 and whether she considered raising an objection under 404(b). Although trial counsel stated that she could not recall the photograph from the trial, she testified that "if [she] missed an appropriate legal objection, there was no strategic reason for doing that." The post-conviction court made no rulings on the issue.

Our review of the trial record indicates that the photograph of the petitioner's genitals was never introduced into evidence at trial. Therefore, the petitioner was not prejudiced by trial counsel's failure to object under 404(b). Furthermore, trial counsel filed a pre-trial motion to prohibit testimony regarding "statements in the victim's forensic interview with Dawn Harper that [the petitioner] showed her a photo of his genitals" under Tennessee Rules of Evidence 401, 402, 403, 404, 608 and 701, arguing such testimony would "confuse the jurors" and "predispose them to a belief in the defendant's guilt." The fact that a trial strategy or tactic failed or was detrimental to the defense does not, alone, support a claim for ineffective assistance of counsel. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is given to sound tactical decisions made after adequate preparation for the case. *Id.* The petitioner is not entitled to relief on this issue.

## III.    Failure to Request the Exclusion of the Victim's Statement to Medical Personnel

The petitioner argues trial counsel was ineffective for failing to request the exclusion of the victim's statement to medical personnel as it was hearsay without an exception. The State contends the petitioner has waived this issue for failing to include the

victim's statement in the appellate record. The State further contends the petitioner has failed to prove that trial counsel was deficient or that the petitioner was prejudiced.

Initially, we must address the State's contention that the petitioner waived the issue presented on appeal for failing to include the victim's statement in the appellate record. At the evidentiary hearing, the State requested that the records from both the trial and the direct appeal be incorporated into the evidentiary hearing record. Additionally, this Court can take judicial notice of the records in petitioner's prior appeals to this Court. *See* Tenn. R. App. P. 13(c); *State v. Lawson*, 291 S.W.3d 864, 869 (Tenn. 2009). Therefore, we will review the petitioner's claim on the merits.

At the evidentiary hearing, trial counsel testified that she could not recall whether she considered raising an objection to the victim's statement. However, she agreed that there was not a strategic reason not to object and that the statement was corroborative of the victim's in-court testimony. Although in hindsight, trial counsel conceded there was not a strategic reason for her failure to object, we must evaluate her conduct through her perspective at the time of trial. *See Howell*, 185 S.W.3d at 326 (citing *Strickland*, 466 U.S. at 689). Our review of the trial record indicates that, despite trial counsel's lack of recollection, she filed a pre-trial motion to exclude portions of the victim's statement under Tennessee Rule of Evidence 403, arguing the petitioner had not received any medical reports to substantiate the victim's prior doctor's appointment in September 2010. The fact that a trial strategy or tactic failed or was detrimental to the defense does not, alone, support a claim for ineffective assistance of counsel. *Cooper*, 847 S.W.2d at 528. Deference is given to sound tactical decisions made after adequate preparation for the case. *Id.* Moreover, despite the petitioner's assertion to the contrary, the victim's statement to Ms. Gallion identifying the petitioner was admissible under Tennessee Rule of Evidence 803(4), the hearsay exception for statements made for the purpose of medical diagnosis and treatment. *See State v. Howard*, 504 S.W.3d 260, 280 (Tenn. 2016) ("We have repeatedly held that "statements made to a physician identifying a perpetrator who is a member of the child's household may be reasonably pertinent to proper diagnosis and treatment of emotional and psychological injury.") (citations omitted) (quoting *State v. Stinnett*, 958 S.W.2d 329, 333 (Tenn. 1997). The petitioner is not entitled to relief on this issue.

### *Conclusion*

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE